UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No.  21-CR-10243-GAO |
| | ) | |
| BARNDOL SUONG, | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S MOTION FOR RECONSIDERATION OF
ORDER SUPPRESSING FIREARM AND AMMUNITION**

The United States of America, by and through the United States Attorney for the District of Massachusetts and undersigned Assistant United States Attorney, hereby respectfully moves the Court to reconsider its Order suppressing the fruits of a search of Defendant Barndol Suong's residence, specifically a firearm and ammunition he was keeping in his bedroom dresser. D.E. 85, Opinion and Order, September 30, 2022.  In ruling that the search warrant for the residence lacked probable cause, the Court found that the information of Defendant's role in an ongoing narcotics distribution conspiracy relied upon by the issuing magistrate judge was stale.  The Court also declined to apply the good faith exception to the exclusionary rule, deeming the affidavit "barebones" as to Defendant's residence at the time the warrant was sought.  The emphasis of the Court's staleness determination was contraband.  Had the government been primarily seeking contraband in the search, the Court's logic would undoubtedly be sound.  However, the search warrant focused on records, not contraband, specifically digital records likely to be found on mobile phones and other electronic devices.  This evidence was very likely to be found in Defendant's residence at the time of the search warrant application.

Because the Court's attention was trained on contraband, and not on the durable and persistent records sought by the search warrant, the Court's view of probable cause was distorted.

Appropriately redirected on the objectives of the search warrant – the records and the electronic devices, specifically, Defendant's mobile phone – the Court should find that there was probable cause for the search of evidence of this nature, which is amply supported by the supporting affidavit.  Even if the Court concludes upon reevaluation of the search warrant that probable cause was still lacking, application of the good faith exception would nevertheless be justified.

## **THE SEARCH WARRANT**

On June 9, 2021, Special Agent Matthew Zaremba ("SA Zaremba") of the Federal Bureau of Investigation ("FBI") applied to Magistrate Judge Donald Cabell ("MJ Cabell") for a search warrant for 71 Corbett Street, Lowell, Massachusetts, where the Defendant was residing.  MJ Cabell authorized the warrant, which was one of several search warrants targeting members and associates of One Family Clique ("OFC").  OFC was a criminal street gang based in Lowell, Massachusetts.  In August 2018, a group of federal, state, and local law enforcement agencies led by the FBI began a joint investigation of violence, weapons possession, and narcotics trafficking by OFC.  The investigation culminated the day after SA Zaremba's application, on June 10, 2021, when law enforcement officers coordinated numerous court-authorized searches of premises and arrests of 14 subjects of the investigation, including Defendant.  SA Zaremba was not present at 71 Corbett Street, and he was not involved in the execution of the search warrant there.

Investigators sought specific evidence at 71 Corbett Street in the form of physical and digital records related to Defendant's participation in OFC's ongoing narcotics distribution activities, most notably a cellular telephone assigned phone number 978-995-8091 ("Phone 8091"), that they believed Defendant had been using for an extended period of time during the conspiracy.  The affidavit SA Zaremba submitted to MJ Cabell in support of the search warrant application for 71 Corbett Street, the "Zaremba Affidavit," set forth the basis for the search and

seizure of records and electronic devices pertaining to the conspiracy, but not contraband. The Zaremba Affidavit demonstrated how Phone 8091 was not only an instrumentality of the conspiracy, but also digital evidence of the conspiracy and Defendant's involvement therein – especially the text messages with the conspiracy's leader and OFC founder, Sarath Yut ("Yut") that were likely stored on the device. The Zaremba Affidavit described in extensive detail an episode in November 2020 when Defendant helped Yut to retrieve a package from the United States Postal Service ("USPS") believed to contain cash proceeds of the group's narcotics trafficking, focusing on the Defendant's use of Phone 8091 while assisting Yut.

In an effort to secure evidence of Defendant's participation in the conspiracy unobtrusively and while the investigation was still covert, investigators served preservation letters on the cellular service provider for Phone 8091, Verizon Wireless, between November 17, 2020 and January 21, 2021. *See* FBI Preservation Letters to Verizon Wireless, Ex. 1. Before expiration of the preservation period, on or about April 9, 2021, SA Zaremba served a search warrant authorized by MJ Cabell for records maintained by Verizon Wireless for Phone 8091, specifically text message content for the relevant time period, November 5, 2020 through November 23, 2020. *See* Affidavit, Search Warrant Case Number 21-MJ-1211-DLC, Ex. 2, ¶ 41. Verizon Wireless responded on April 22, 2021, but despite the preservation letters, the November 2020 text message contents of Phone 8091 had already been expunged from the service provider's systems. *See* FBI Internal Email Correspondence, April 22, 2021, Ex. 3. This search warrant followed approximately six weeks later.

Officers executing the search warrant at 71 Corbett Street on June 10, 2021, seized several cellular telephones associated with Defendant and his significant other, Savoeurn Choun ("Choun"), who was also believed to be involved in the retrieval of the USPS package in

November 2020, including Phone 8091.  In addition, in Defendant's bedroom, officers discovered the chief evidence of the offense charged in this case: the .45 caliber Taurus pistol revolver that had been reported stolen in Rhode Island in 2017, and 20 rounds of ammunition.  Officers also found empty ammunition and gun boxes elsewhere in Defendant's residence.  Defendant admitted that he had armed himself because of gun violence in Lowell.[1]  Indeed, Defendant admitted that the gun seized in his home on June 10, 2021, was not the first gun he had acquired illegally because of the violence involving his gang, OFC.[2]

## ARGUMENT

I.   MJ Cabell had a "substantial basis" to find a nexus between Defendant's residence, Phone 8091 and related records and items, and the drug trafficking conspiracy, and official reliance on the Zaremba Affidavit was objectively reasonable.  Therefore, at minimum, the *Leon* good faith exception should apply.

When reviewing a search warrant for probable cause, the district court must accord "great deference" to the magistrate judge's determination.  *See United States v. Ciampa*, 793 F. 2d 19, 22 (1st Cir. 1986).  The duty of the review court "is simply to ensure that the magistrate had a

---

[1] MJ Cabell conducted a probable cause and detention hearing on June 14, 2021, after which he ordered Defendant detained pending trial, finding that no condition or combination of conditions of release would reasonably assure the safety of any other person and the community.  18 U.S.C. § 3142(e)(1); *see* Order of Detention Pending Trial, D.E. 9. During that hearing, counsel for Defendant argued:

> Now, I might point out that I asked him, so, you knew you were a felon, why did you have the gun. And he said his sister who lives right next door to him at 77 Corbett was the victim of an attempted shooting. And that he's worried about his own safety and the safety of his kids and his family. And he feels that he's vulnerable.

Transcript of Probable Cause and Detention Hearing, June 14, 2021, D.E. 16, 79:13-18.

[2] In an interview with investigators during the June 10, 2021 search at 71 Corbett Street, Defendant acknowledged his membership in OFC and discussed the shooting where his sister lived nearby at 77 Corbett Street on July 14, 2018. *See* FBI Report of Interview with Barndol Suong, June 10, 2021, Ex. 4. Thirty minutes after the shooting on Corbett Street, what was likely a retaliatory shooting took place elsewhere in Lowell. *Id*. at 2. Defendant denied involvement in the retaliation. *Id*. However, two days after that shooting, on July 16, 2018, Lowell Police Department officers seized a 9mm handgun from inside of 71 Corbett Street. *See* Lowell Police Department Incident Report 2018-00116644A, Ex. 5, 3. Defendant was not arrested. Defendant told investigators that he received that gun around the time of the July 2018 shooting, just in case "something happens." Ex. 5, 2.

'substantial basis for . . . conclude[ing]' that probable cause existed." *United States v. Taylor*, 985 F. 2d 3, 5 (1st Cir. 1993) (quoting *Illinois v. Gates*, 461 U.S. 213, 238 (1983)).  The U.S. Supreme Court has emphasized in its Fourth Amendment jurisprudence the strong preference for warrants, such that reviewing courts will normally defer to an issuing magistrate's probable cause determination in a doubtful or marginal case.  *See United States v. Zayas-Diaz*, 95 F. 3d 105, 111 (1st Cir. 1996), (citing *United States v. Ventresca*, 380 U.S. 102, 109 (1965)); *see also United States v. Leon*, 468 U.S. 897, 914 (1984).

In this case, the Zaremba Affidavit provided MJ Cabell with a "substantial basis" to conclude that probable cause existed to search 71 Corbett Street for Phone 8091 and related records and items.  Even if the Court was "doubtful," MJ Cabell's probable cause determination was entitled to deference.  The First Circuit recently reiterated the probable cause standard articulated by the Supreme Court: "The judicial task in a probable-cause determination is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Chiu*, 36 F.4th 294, 297 (1st Cir. 2022) (citing *Gates*, 461 U.S. at 213).  "Fair probability," the Supreme Court has cautioned, "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014).  It is not a "more likely than not" or "more likely true than false" standard.[3]  And when interpreting a search warrant affidavit describing an ongoing drug trafficking

---

[3] *Texas v. Brown*, 460 U.S. 730, 742 (1983); *United States v. Gonzalez-Arias*, 946 F.3d 17, 25 (1st Cir. 2019); *United States v. Rivera*, 825 F.3d 59, 63 (1st Cir. 2016); *United States v. Soto*, 799 F.3d 68, 84 (1st Cir. 2015); *United States v. McLellan*, 792 F.3d 200, 209 (1st Cir. 2015); *United States v. Woodbury*, 511 F.3d 93, 98 (1st Cir. 2007); *United States v. Grant*, 218 F.3d 72, 75 (1st Cir. 2000); *United States v. Feliz*, 182 F.3d 82, 87 (1st Cir. 1999); *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir. 1979) (rejecting a defense argument that "would define [probable cause] mathematically to mean 'more likely than not' or 'by a preponderance of the evidence'"); *see also United States v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir. 2011) (Gorsuch, J.) (collecting cases holding that a "fair probability" "need not reach the fifty percent mark," that probable cause is not a "more likely than not" standard, and that it "is something less than a preponderance"); *but see Valente v. Wallace*, 332 F.3d 30, 32 (1st Cir. 2003) (stating incorrectly that this issue is "arguably unsettled," without addressing *Brown*, *Grant*, *Feliz*, or *Melvin*).

conspiracy like this case, the Court considers the "totality of the circumstances" set forth in the affidavit, including the affiant's experience and opinions and commonsense inferences about the likelihood that evidence of the drug trafficking conspiracy will be found at the suspect's residence. *Chiu*, 36 F.4th at 298-99; *see United States v. Feliz*, 182 F. 3d 82, 87-88 (1st Cir. 1999) (upholding a search warrant for the residence of a "long-time, successful, drug trafficker," even though no evidence tied drug trafficking to the residence, because, if drug trafficker "did not maintain his accounts and records, and the presumably large sums of money received in the course of his dealings, at his apartment, where else would he keep them?").

If the probable cause the standard is not a high bar, the good faith exception under *Leon* is a low bar, indeed.  In *Leon*, the Supreme Court held that "[c]ourts should not . . . suppress evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant."  *Leon*, 468 at 922.  The *Leon* analysis shifts the Court's focus from the inquiry into whether there existed a "substantial basis" for the probable cause determination made by the issuing magistrate, to the less demanding "objectively reasonable officer" standard.  *See Zayas-Diaz*, 95 F.3d at 112-14.  If an objective officer could reasonably believe an affidavit established probable cause based upon the facts described and all fair inferences therefrom, then the officer searched and seized evidence in good faith and it need not be suppressed despite the lack of probable cause for the warrant.  *Id*. at 115 (suppression denied despite missing information in affidavit that undermined probable cause because executing officer could reasonably infer the missing information from the totality of circumstances disclosed in affidavit).

A finding of objective good faith is inappropriate when an officer's affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" – in other words, when an affidavit is "barebones."  However, an affidavit is not "barebones" simply

because it falls short of the probable cause standard.[4]  A reviewing court need only identify in the

affidavit "some modicum of evidence, however slight" between the criminal activity at issue and

the place to be searched to render official reliance on the warrant reasonable.  *United States v.*

*Laughton*, 409 F. 3d 744, 749 (6th Cir. 2005).

The Zaremba Affidavit contains ample information connecting Defendant, Phone 8091,

and the drug trafficking conspiracy.  At minimum, the facts are sufficient to allow an objectively

reasonable officer to infer that Defendant remained involved in a successful, ongoing drug

trafficking conspiracy, and that evidence of his participation in the conspiracy would be found in

Phone 8091, which was likely to be located at Defendant's residence.  The Court's scrutiny of the

Zaremba Affidavit upends the conventional standards for evaluating the judgments of MJ Cabell

and the executing officers, who appreciated salient facts and fair inferences from the affidavit that

the Court overlooked or underestimated.

Importantly, the Zaremba Affidavit related the following information linking Defendant

with the drug trafficking conspiracy, and the drug trafficking conspiracy to Defendant's residence,

71 Corbett Street – particularly Phone 8091:

1. At the time of the search warrant application, the FBI had been
   investigating the illegal drug and firearm trafficking of Yut, the founder
   and leader of OFC, and other OFC members and associates for almost
   three years, beginning in August 2018.  Aff. ¶ 13-14.  Although the
   Zaremba Affidavit did not explicitly state it, Defendant's membership in
   OFC may be inferred from Defendant's frequent contact with Yut,
   Defendant's participation in the retrieval of PARCEL 53523, Defendant's
   receipt of numerous Cash App payments from Yut with the message "dead
   broke recordz", and the presence of the number "323" in Defendant's

---

[4] *United States v. White*, 874 F. 3d 490, 497 (6th Cir. 2017) ("There must be daylight between the 'bare-bones' and
'substantial basis' standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding
Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function."); *United States v.
Bell*, 832 F. App'x 298, 301 (5th Cir. 2020) (reversing suppression order of district court and applying good faith
exception because affidavit, while lacking in probable cause, provided "enough observations and inferences"
indicating that contraband was likely to be found at residence to justify official reliance).

Cash App $Cashtag, "2tall323". "323" is code for "CBC", which itself is an abbreviation for Crazy Brother Clan, a sub-group of OFC. Aff. ¶ 13.[5]

2. In furtherance of the ongoing drug trafficking conspiracy, Yut used USPS to facilitate the sourcing of illegal narcotics. Aff. ¶ 15. OFC members had different roles in the conspiracy. Peouveashnah Pin ("Pin"), for instance, conducted street-level drug deals. Aff. ¶¶ 16-17. Yut enlisted the assistance of other members of OFC, like Chomroeun Keo ("Keo"), to receive and transport the USPS packages containing narcotics. Aff. ¶ 18.

3. Yut promoted the ongoing drug trafficking conspiracy with electronic payments to co-conspirators identified with the term "dead broke recordz". Aff. ¶ 46. Between October 2018 and January 2020, Yut made 13 "dead broke recordz" payments to Defendant's Cash App $Cashtag, "2tall323", totaling $5,320. *Id*.

4. Yut also used USPS to send cash payments to his suppliers. Aff. ¶ 15. From January 2020 to August 2020, Yut, inventing sender and recipient identities, mailed at least 12 packages containing an estimated $594,000 to an address in Del Mar, California. Aff. ¶ 22.

5. On November 3, 2020, Yut mailed another package to the same Del Mar address: PARCEL 53523. Aff. ¶ 26. Yut used a return address of "C. PYNE, 58 Corbett St., Lowell, MA 01851" – the address of an actual residence very close to 71 Corbett Street. Aff. ¶ 24.

6. Defendant's address on file with the Massachusetts Registry of Motor Vehicles was 71 Corbett Street. Aff. ¶ 31, fn. 14. Defendant's father owns 71 Corbett Street. *Id*. Officers of Lowell Police Department documented multiple encounters with Defendant at 71 Corbett Street, including on August 31, 2020.

7. Between November 7, 2020 (the day after USPS deemed PARCEL 53523 undeliverable at the Del Mar destination address) and November 18, 2020 (the day before Yut retrieved PARCEL 53523 in Lowell), Yut and Defendant, using both Phone 8091 and a second phone, exchanged approximately 50 text messages, and mad approximately eight phone calls. Aff. ¶¶ 37, 40, 41.

---

[5] "Considerable deference" should be given to reasonable inferences the magistrate judge may have drawn from the attested facts. *United States v. Bucuvalas*, 970 F.2d 937, 940 (1st Cir. 1992). The good faith exception allows a reasonable officer to indulge inferences that would otherwise be insufficient to establish probable cause. *See Zayas-Diaz*, 95 F.3d at 115; *White*, 874 F. 3d at 498.

8.  Yut provided Defendant the USPS tracking information for PARCEL 53523, and Defendant tracked PARCEL 53523 online using Phone 8091 on November 9, 2020 at 12:20 p.m. and 3:49 p.m.

9.  On November 16, 2020, merely two hours are USPS attempted to return PARCEL 53523 to the fictitious sender at 58 Corbett Street, Yut called USPS to inquire about PARCEL 53523.  Aff. ¶¶ 30-31.  Yut told USPS that his friend who lived at 71 Corbett Street actually mailed PARCEL 53523.  *Id*.

10. On November 16, 2020 (the same day USPS attempted to return PARCEL 53523 to 58 Corbett Street), Yut and Defendant, using Phone 8091, exchanged approximately 20 text messages and made approximately three phone calls, at about the same time Yut was also calling USPS facilities. Aff. ¶ 41.

11. On November 19, 2020, Yut and Defendant's significant other, Savoeurn Choun ("Choun"), retrieved PARCEL 53523 together from the Lowell Post Office.  Aff. ¶ 35.  Choun lives with Defendant at 71 Corbett Street. Aff. ¶ 41.

12. Phone 8091 was stored in Yut's cellular telephone as "Towers", a variation of Defendant's nickname, "Tall."  Aff. ¶ 45.

13. Defendant was the subscriber of cellular service for Phone 8091, and 71 Corbett Street, Lowell, Massachusetts is the address associated with Phone 8091 in Verizon Wireless records.  Aff. ¶ 45.

14. Defendant was the account holder of the Cash App account with $Cashtag "2tall323", and Phone 8091, address 71 Corbett Street, Lowell, Massachusetts, and email bsuong978@gmail.com are all associated with the account in Cash App records.  Aff. ¶ 46.

15. In the seven-month period preceding SA Zaremba's application for this search warrant, between November 1, 2020 and May 15, 2021, service provider records showed 245 contacts between Phone 8091 and Yut's cellular telephone.

In addition, the Zaremba Affidavit incorporated by reference three other affidavits he had authored in support of prior search warrant applications: (i.) the "Zaremba May 4, 2020 Affidavit" in Search Warrant Case 20-MJ-1051-DLC, *see* Ex. 6; (ii.) the "Zaremba August 13, 2020 Affidavit" in Search Warrant Case 20-MJ-1539-DLC, *see* Ex. 7; and (iii.) the "Zaremba April 9,

2021 Affidavit" in Search Warrant Case 21-MJ-1212-DLC, *see* Ex. 8.[6]  As such, these earlier affidavits and the Zaremba Affidavit are effectively one and the same.   The earlier affidavits supplemented the information relevant to MJ Cabell's probable cause determination as follows:

16. On September 12, 2018, in a phone call monitored and recorded by the Buckingham Correctional Center in Virginia, Yut discussed drug trafficking with incarcerated co-conspirator Michael Mao ("Mao").  Ex. 6 ¶ 22.  Yut explained that he didn't "do dirt" with reckless people; he "will only do dirt" with Mao and "Tall", referring to Defendant.  *Id.*

17. On April 23, 2019, Yut again discussed drug trafficking with Mao on a monitored and recorded phone line.  Ex. 7 ¶¶ 24-25.  Yut described how the drug trafficking conspiracy operated.  Yut told Mao that everything arrived through the mail, and that he had an army out and a little spot.  *Id.* at ¶ 24.  Yut also detailed how he offered an individual named "Shane" $250 for every shipment he received on behalf of Yut.  *Id.* at ¶ 25.  YUT told Mao that if the "pigs" kicked the doors down and asked questions, then the individuals who worked for him could play stupid.  *Id.*  YUT advised them to use excuses such as "it is my address but it isn't my name" on the packages they received.  *Id.*  YUT also stated that he would send packages to an address without a name, labeling it "return to sender" on the right side of the package.  *Id.*

18. On October 12, 2019, Yut transferred $250 to Keo from his Cash App account with the message "dead broke recordz".  Ex. 8 ¶ 28.  On October 17, 2019, Keo received a USPS package on behalf of Yut at his residence, which he later delivered to a "stash house" used by participants in the drug trafficking conspiracy.  *Id.* at ¶¶ 26-27.  Yut instructed Keo in text messages to take an additional $50 cash from the proceeds of an illicit narcotics transaction, as payment for his assistance.  *Id.* at ¶ 28.

---

[6] In its Order, the Court appears to dismiss these references to the earlier affidavits because they were "not offered in support of the warrant at issue here."  *See, e.g.,* D.E. 85 p. 7.   A different affidavit need not always be physically attached to support a search warrant application, however. See, *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 700 (9th Cir. 2009) (observing in rejecting search warrant challenge that "there are no required magic words of incorporation"); *United States v. Lazar*, 604 F.3d 230, 236 (6th Cir. 2010) (same, and noting that "'[i]ncorporation' of one thing into another need not be by express 'reference'"); *Baranski v. United States*, 515 F.3d 857, 860 (8th Cir. 2008) (warrant that "referred" to an affidavit successfully incorporated it even though the affidavit itself did not "accompany" warrant).  All three affidavits incorporated by reference were previously reviewed by MJ Cabell.  *See United States v. Sheehan*,18-CR-10391-RGS, 2020 WL 429447, at *2 fn. 3 (D. Mass. January 28, 2020) (finding that it  may reasonably inferred that issuing judge was "aware" of earlier warrant issued by "his court," where affiant listed docket number four times but did not specifically incorporate it by reference).  The facts contained therein were known to MJ Cabell at the time of this search warrant application and properly supplemented his analysis of probable cause.  Therefore, the Court should take them into account when reviewing MJ Cabell's probable cause determination.

19. On August 4, 2020, Yut mailed two packages destined for different
addresses in California, one being the same Del Mar address as PARCEL
53523.  Ex. 7, ¶¶ 85-86.  He mailed the first from the Chelmsford Post
Office, and the second from the North Billerica Post Office an hour later.
*Id*.  Yut provided the same sender information for both packages: "BNS,
58 Corbett Street, Lowell, Massachusetts 01852".  *Id*. at ¶ 86.

This information, taken collectively, afforded MJ Cabell a substantial basis to believe that evidence of drug trafficking would be found at 71 Corbett Street in June 2021.  The Zaremba Affidavit establishes that Defendant was a drug trafficker in a conspiracy of a continuous and ongoing nature.  *See Feliz*, 182 F. 3d 82.  More importantly, there was support for the inference that Defendant's role in the drug trafficking exceeded a single episode of drug-related activity.  *Cf. Chalas*, 478 F. Supp. at 151 (D. Mass. 2020).  The Zaremba Affidavit distinguishes Defendant's role, drawing parallels with Keo, who was primarily responsible for transporting USPS packages. In contrast, the Zaremba Affidavit does not suggest that Defendant was dealing narcotics, like Pin. Defendant received over $5,000 from Defendant via Cash App over a significant period during Yut's drug trafficking.  Given the "dead broke recordz" label attached to the payments, it is an eminently fair inference that these payments – like the October 12, 2019 the payment to Keo – were associated with participation in Yut's drug trafficking conspiracy.  The force of this inference emerges in stark relief coupled with the Zaremba Affidavit's detailed account of Defendant and Choun's efforts to help Yut retrieve PARCEL 53523.

It would be an overly constrained reading of the Zaremba Affidavit to conclude that Yut's payments to Defendant were limited to Cash App and ceased in January 2020.  Yut did pay Keo in cash, after all, and cash is the frequent medium of exchange for drug traffickers in SA Zaremba's training and experience.  Aff. ¶ 43(a.).  But most importantly, of course, is the fact that Defendant provided significant assistance to Yut in November 2020 without evidence of a corresponding "dead broke recordz" Cash App payment.  It stands to reason from the Zaremba Affidavit that

Defendant was indeed compensated for that assistance, and that the FBI's investigation simply failed to identify the methods of payment Yut and Defendant employed after January 2020.  Given the "shadowy world of drug dealing," the absence of evidence of payments between conspiring drug traffickers hardly implies that their criminal activity has ceased.  *See United States v. Nocella*, 849 F. 2d 33, 40 (1st Cir. 1988).  And a fair reading of the Zaremba Affidavit implies the opposite – Defendant's membership in OFC and regular phone communication with Yut in the months leading up to the search of 71 Corbett Street demonstrates his consistent and persistent participation in the drug trafficking conspiracy.  These facts illustrate a continuing pattern of criminal conduct that supports a finding of probable cause.  *Id*.

The most compelling reason to believe that evidence of drug trafficking and money laundering existed at 71 Corbett Street is the ample evidence of electronic transactions and communications with Yut, and Phone 8091, in particular.  Evidence of the commission of these kinds of crimes by individuals involved in long-running operations like Yut's will often be found in a residence, *see Feliz*, 182 F. 3d at 88, and a drug trafficker's phone is likely to be found in the same place – especially when a search is conducted early in the morning hours, like it was in this case.  Aff. ¶¶ 43, 64; *see United States v. Griffith*, 867 F.3d 1265, 1273 (D.C. Cir. 2017).  MJ Cabell considered ample evidence of Defendant's use of electronic devices in connection with drug trafficking and money laundering, including two different cellular telephones to communicate with Yut during the retrieval of PARCEL 53523, and Phone 8091, in particular, to track PARCEL 53523.  In addition, MJ Cabell may have reasonably inferred Defendant's possession and use of Phone 8091 or another electronic device to receive Yut's electronic Cash App transfers.  The inference of Choun's possession and use of electronic equipment like a cellular telephone to communicate with Defendant and Yut also could not be discounted.

12

Evidence generated and stored by these devices and accounts, and records associated with the ownership and use of the devices and accounts, were likely to be relevant the prosecution of Defendant, Yut, and others for drug trafficking and money laundering – particularly the contents of text message communications from November 2020.   The Zaremba Affidavit makes clear that Phone 8091 was active and remained in use by Defendant less than a month prior to the search warrant application.  Accordingly, there was an ample basis to believe that records and electronic equipment, constituting instrumentalities of drug trafficking and money laundering and containing evidence of these offenses, including Phone 8091, would be located at 71 Corbett Street.

The objects of the search authorized by MJ Cabell defy Defendant's claims of staleness. The Supreme Court has observed "in the cell phone context" that "it is reasonable to expect that incriminating information will be found on a phone regardless of when the crime occurred."  *Riley v. California*, 573 U.S. 373, 399 (2014).  Courts have routinely upheld searches for drug trafficking and money laundering evidence in cellular telephones and records after the passage of seven-months' time.[7]  *See United States v. Gurpee*, 682 F. 3d 143, 146-7 (1st Cir. 2012) (drug transaction took place on November 9, 2007, and search warrant for residence for cellular telephone was issued on May 28, 2008); *United States v. Procopio*, 77 F. 3d 21, 26 (1st Cor. 1996) (search warrant for defendant's residence for financial records in money laundering investigation not stale after 14

---

[7] *See United States v. Gurpee*, 682 F. 3d 143, 146-7 (1st Cir. 2012) (drug transaction took place on November 9, 2007, and search warrant for residence for cellular telephone was issued on May 28, 2008); *United States v. Procopio*, 77 F. 3d 21, 26 (1st Cor. 1996) (search warrant for defendant's residence for financial records in money laundering investigation not stale after 14 months); *United States v. Ostrowski*, 822 F. Supp. 2d 66, 72 (D. Mass. 2011) (warrant seeking evidence of money laundering occurring between one and two years prior to the issuance of the warrant was not stale); *United States v. Derman*, 23 F. Supp. 2d 95, 99 (D. Mass. 1998) (December 1995 warrant seeking evidence of money laundering occurring May 1994 was not stale); *see also Bucuvalas*, 970 F. 2d at 941 (despite none of information in search warrant affidavit being less than four years old, the warrant was not stale because records sought were of "enduring utility," such as licensing information, documentary evidence, and important records related to ownership and operational control of enterprise, which could reasonably be expected to be kept at a secure, centralized location); *United States v. Ribeiro*, 397 F.3d 43, 47 (1st Cir. 2005) (confirming the legitimacy of a "documentary search warrant" and citing cases).

months);  *United States v. Ostrowski*, 822 F. Supp. 2d 66, 72 (D. Mass. 2011) (warrant seeking evidence of money laundering occurring between one and two years prior to the issuance of the warrant was not stale); *United States v. Derman*, 23 F. Supp. 2d 95, 99 (D. Mass. 1998) (December 1995 warrant seeking evidence of money laundering occurring May 1994 was not stale); *see also Bucuvalas*, 970 F. 2d at 941 (despite none of information in search warrant affidavit being less than four years old, the warrant was not stale because records sought were of "enduring utility," such as licensing information, documentary evidence, and important records related to ownership and operational control of enterprise, which could reasonably be expected to be kept at a secure, centralized location).

Incriminating evidence likely to be found in Phone 8091 and related evidence and records establishes the requisite nexus to 71 Corbett Street.   "[C]ourts ... do not measure the timeliness of collected information mechanistically, merely counting the number of days elapsed" but instead consider a number of factors, including "the nature of the information, the nature and characteristics of the supposed criminal activity, the nature and characteristics of the place to be searched, the nature of items delineated in the warrant-and the likely endurance of information ...." *United States v. Schaefer*, 87 F.3d 562, 568 (1st Cir.1996).  Here, the nature of the evidence sought is dispositive.  Mobile phones, electronic devices, and physical and digital records are all evidence of the sort that can reasonably be expected to be kept for long periods in a residence.  At the time of the search warrant application, Phone 8091 was still active and both Defendant and Choun were still living at 71 Corbett Street.  These facts reinforced the belief the that 71 Corbett Street was the locus of evidence sought by the warrant.  *See Ribeiro*, 397 F. 3d at 50 (defendant engaging in criminal conduct accompanied by girlfriend and baby suggested drug dealing and home life were intertwined, supporting probable cause for search of residence).

Against this backdrop, the Court's ruling under *Leon* strikes a dissonant chord. The Zaremba Affidavit cannot fairly be described as "so lacking in sufficient indicia of probable cause . . . that any official belief in its existence was unreasonable." D.E. 85 at 13. The Court seems to recognize a tension in its decision by narrowing its finding "as to the target premises at the time the warrant was sought." *Id*. However, while this level of scrutiny of the nexus may be appropriate upon review of MJ Cabell's probable cause determination, it betrays the standard to which the Court should hold the executing officers who acted in good faith on a facially valid search warrant issued by a neutral and detached magistrate judge. *See United States v. Bell*, 832 F. App'x 298, 301 (5th Cir. 2020) ("But, under the good-faith exception, we do not assess whether there definitively was such a nexus — we instead consider whether officers objectively could reasonably believe that there was. The question here is therefore: did the officers provide enough observations and inferences indicating contraband was likely to be found at the Residence that they could reasonably believe the state court's probable cause determination?").

Barebones affidavits are inadequate because they present "a mere affirmation of suspicion and belief without any statement of adequate supporting facts." *Nathanson v. United States*, 290 U.S. 41, 46 (1933). They typically arise in short, formulaic, or form affidavits, and often involve confidential sources of information conveyed in self-serving or conclusory fashion. *See United States v. Brown*, 567 F. App'x 272, 281-83 (5th Cir. 2014) (finding that officers "could not have acted in objectively-reasonable good-faith reliance upon the search warrant" where the one-page affidavit failed to include details of the investigation or specific facts as to the credibility of the informant); *United States v. Gonzales*, 399 F.3d 1225, 1231 (10th Cir. 2005) (no factual basis connecting the place to be searched to the defendant or suspected criminal activity); *United States v. Coleman*, 540 F. Supp. 3d 596, 605 (S.D. Miss. 2021) (fill-in-the blank affidavit that was silent

as to the confidential informant's basis of knowledge).  However, the length of an affidavit is not always dispositive; even very short applications may overcome the low bar under *Leon*.  *See United States v. Mayle*, 382 F. App'x 329, 330–31 (4th Cir. 2010) (2-page affidavit sufficient); *United States v. Huerra*, 884 F.3d 511, 515 (5th Cir. 2018) (5-page affidavit sufficient).

Like probable cause, the barebones evaluation under *Leon* turns on the totality of the circumstances.  *United States v. Fisher*, 22 F. 3d 574, 578 (5th Cir. 1994).  The Zaremba Affidavit does not fit this category of affidavits.  It sets forth underlying factual circumstances "regarding veracity, reliability, and basis of knowledge" of Defendant's earlier involvement in drug trafficking and money laundering that permitted the executing officers to draw the reasonable inference that evidence of those crimes would be found at 71 Corbett Street in June 2021.  *United States v. Weaver*, 99 F. 3d 1372, 1380 (6th Cir. 1996).  Specifically, evidence in the Zaremba Affidavit of (i.) the persistent drug trafficking operation managed by Yut; (ii.) Defendant's receipt of substantial sums from Yut under circumstances comparable to demonstrated money laundering with another participant in the conspiracy; (iii.) the integral part Defendant, Choun, and Phone 8091 played in the retrieval of PARCEL 53523; (iv.) Defendant, Choun, and Phone 8091 established and ongoing connection to 71 Corbett Street; and (v.) and Defendant's continuous and recent use of Phone 8091 to communicate with Yut, all would lead an objectively reasonable officer to rely upon the issuing magistrate's probable cause determination. *See United States v. Frazier*, 423 F. 3d 526, 536 (6th Cir 2005) (good faith standard satisfied where stale affidavit contained phone records showing that defendant was in constant contact with known drug dealers); *United States v. Mubarak*, 20-CR-10300-ADB, 2022 WL 2971881, at *9 (D. Mass. July 27, 2022) (evidence of a long-standing drug organization, recorded meetings and controlled buys with a confidential informant, some facts connecting the criminal activity to a residence, and a

consistent pattern of money laundering activity related to that drug trafficking, was not so obviously deficient as to make the agents' reliance on the warrant unreasonable); *United States v. Martineau*, 03-CR-10298-NMG, 2005 WL 5517798, at *10–11 (D. Mass. Feb. 23, 2005) (despite no "long-standing drug dealing", residential search warrant met the good faith test because of evidence that conduct was ongoing and that defendant and co-conspirator had a continuing connection).

Because the Zaremba Affidavit allowed the inference that Defendant's use of Phone 8091 in past conspiratorial conduct was continuous and ongoing, application of the good faith exception is warranted. It was reasonable to believe that Phone 8091 would be found during a search of 71 Corbett Street on June 10, 2021, and that the device would yield evidence of drug trafficking and money laundering. Requiring executing officers to disregard a search warrant issued on a lengthy affidavit documenting an extensive, long-term drug conspiracy on staleness grounds simply does not accord with the principles of *Leon*. *See United States v. Dethlefs*, 883 F. Supp. 766 (D. Me. 1995) (search based on stale information in drug trafficking and money laundering case upheld on basis of good faith, as lack of "current information suggesting that the drug conspiracy continued" was not a defect "of the kind which would alert an executing officer"); *see also United States v. Gant*, 759 F. 2d 484, 488 (5th Cir. 1985) (encouragement to obtain warrants before conducting searches is undermined by requiring officials to second-guess the magistrate's determination).

*Leon* recognized that there are no benefits to suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant. 468 U.S. at 922. The executing officers here reasonably believed that the warrant authorized them to search 71 Corbett Street. Therefore, even if that belief was mistaken – and the government is aware of no authority suggesting that MJ Cabell did not have a substantial basis to issue the warrant to search 71 Corbett

Street for Phone 8091 and related records and evidence – there would be no basis for employing the "extreme sanction of exclusion," *Herring v. United States*, 555 U.S. 135, 140 (2009), or "the massive remedy of suppressing evidence of guilt," *Hudson v. Michigan*, 547 U.S. 586, 599 (2006).

II.   <u>*Grupee*, not *Chalas*, is the appropriate precedent for this search warrant, as the focus of the warrant is not contraband but instead Phone 8091 and related records.</u>

In its Order granting suppression, the Court relied principally on the *Chalas* decision. In *Chalas*, the proceeds of a search warrant executed at defendant's apartment were suppressed. 478 F. Supp. 3d at 152. Information from the *Chalas* search warrant affidavit supporting the belief that drugs would be found in the defendant's apartment was limited to evidence of one meeting with a co-conspirator to process drugs at the apartment six weeks before the search warrant application, and the affiant's suspicion that the defendant's apartment was used as a drug stash house. *Id*. at 151. The *Chalas* court held that the six-week interval between the search and the evidence of drugs in the apartment, without more, rendered the evidence stale as a matter of law. *Id*. Application of the good faith exception was "a much closer question," but the *Chalas* court ultimately granted suppression, concluding that official belief in a warrant to search for drugs at the defendant's apartment six weeks after a single instance of drug trafficking activity was not reasonable. *Id*. at 151-52.

While this case bears some superficial similarities to the facts of *Chalas*, the persuasive force of *Chalas* evaporates when the Court reorients its view to the primary objectives of the search warrant here: Phone 8091 and related devices and records. There are three important factors distinguishing *Chalas*, and the first and foremost is the target evidence of the search warrants. The nature of the connection between the defendants and their drug trafficking co-conspirators is another factor. Finally, *Chalas* is distinguished by the treatment of the defendants in the affidavits supporting the search warrants.

18

Investigators in *Chalas* were searching for drugs. The evidence sought in the Zaremba Affidavit, however, was not specifically drugs or drug paraphernalia. The Zaremba Affidavit merely mentioned drug paraphernalia once, *see* Aff. ¶ 43, and it also cited controlled substances and drug sale proceeds as one possible connection between the drug trafficking and 71 Corbett Street. *Id.* at ¶¶ 43(a.), 43(d.). Unlike *Chalas*, the focus of the search warrant was primarily physical and digital records, not contraband. *See* ¶¶ 43 ("a common practice for drug traffickers to store drug-related paraphernalia and records in their residences *for longer periods of time than they keep drugs in their residences*") (emphasis added); 43(b.) (drug traffickers often maintain documents related to their drug trafficking activities, i*ncluding in cell phones and other electronic media capable of storing such information electronically*, . . at their residences for an extended period of time, *regardless of whether they are physically in possession of drugs on the premises*) (emphasis added); 43(c.), 43(e.), 43(f.). Specifically, the warrant sought Phone 8091 and computers for electronic records of drug trafficking and money laundering. *Id.* at ¶¶ 47-58. Computers and cell phones are much more likely to remain in a target's possession longer than drugs or drug paraphernalia, making the analogy with *Chalas* improper. *See Grupee*, 682 F.3d at

The second distinction with *Chalas* is the continuing connection between the defendant and the drug trafficking conspiracy. Although *Chalas* recognized that defendant was "obviously" a member of the conspiracy, the evidence of a single meeting in the apartment to process drugs was insufficient to establish probable cause to search the apartment for drugs.

The superficial similarity between with *Chalas*—one incident occurring at the defendant's residence—is a red herring. Recalling that the purpose for the search warrant was to seize Phone 8091 and other related devices and records, the analysis shifts to a continuing connection between the *phone* and the conspiracy. The affidavit clearly shows a continuing relationship between

Defendant and Yut via Phone 8091. Between Nov. 1, 2020 – May 28, 2021, the cellphones identified as Defendant's and Yut's made 245 contacts.  Aff. ¶ 45. Additionally, subpoena results from Cash App identified 13 transfers from Yut's account to Suong's account between October 2018 and January 2020. *Id.* at ¶ 46. Therefore, the affidavit establishes a continuing connection between Suong and Yut, in reference to the conspiracy, through Phone 8091. As such, the analytical focus on the singular event in November is inaccurate.

Implicit in the *Chalas* reasoning was the observation that the affidavit gave relatively little attention to the defendant and the apartment. The defendant was not even mentioned until ¶ 25 of the search warrant affidavit and only substantively discussed in ¶¶ 46-50 and 56. *Chalas*, 478 F.Supp.3d at 147. Those substantive discussions focused on the one instance when drugs ma have been processed at the apartment. *Id.*  After that, the defendant was not mentioned again in the remaining 35 paragraphs.  *Id.* at 147. The concluding paragraphs did not even mention the apartment as one of the targeted residences of the conspiracy.  *Id.*

In contrast, the Zaremba Affidavit addresses Defendant more directly.  The substantive discussion of Defendant's connection to the drug trafficking conspiracy occurs in Paragraphs 44-49, wherein SA Zaremba documents the ongoing communication between Defendant and Yut. Aff. ¶¶ 44-49.  However, Suong is still implicated throughout the affidavit.  Only Paragraphs 11-22, which contextualize the conspiracy, do not directly implicate Defendant.  Paragraphs 55-63 provide information about searching and seizing electronic devices and supports the nexus between such devices and the drug trafficking conspiracy. Although this section does not directly mention Defendant, it further clarifies the purpose of the search warrant to find and seize Phone 8091 and related devices and records for evidence of the conspiracy.

The critical distinction with *Chalas* is the purpose of the search warrants. The Court's analysis should focus on staleness as it relates to Phone 8091 and the electronic and physical records, and therefore reliance on *Chalas* is misplaced. Instead, the Court should analyze this case under *Grupee*. In *Grupee*, law enforcement officers sought "[a]ny and all cellular telephones belonging to [the suspect], [and] [a]ny and all paperwork relating to cellular phone ownership including manuals and similar paperwork" at the target residence. The basis for the search was information acquired from a cooperating witness on November 9, 2007. The warrant issued almost seven months later, on May 28, 2008 – a period of time almost identical to this case. A gun was found during the search. The defendant sought suppression, and the district court denied suppression. On appeal, the First Circuit found that there was probable cause to believe the initial suspect still had the cell phone because of (1) continuity – the defendant needed to stay in business; and (2) evidence that the phone was still in use in May 2008 (even though the evidence did not necessary establish that the suspect was the one using the phone). Here, the Zaremba Affidavit clearly demonstrates that Phone 8091 was still in use at the time of the search warrant application, and that Defendant was still communicating with the orchestrator of the large-scale drug trafficking conspiracy. Therefore, just like in *Grupee*, the evidence in the Zaremba Affidavit supporting the search for Phone 8091 and related devices and records was <u>not</u> stale.

**CONCLUSION**

For all the foregoing reasons, the government requests that the Court reconsider its Order granting suppression and find instead that probable cause existed to issue the search warrant – or, at minimum, that the good faith exception applies.  Accordingly, Defendant's Motion to Suppress should be denied.

<div style="margin-left:50%">

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By: /s/ *Fred M. Wyshak, III*
Fred M. Wyshak, III
Assistant United States Attorney

</div>

Date:   October 28, 2022

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on October 28, 2022.

<div style="margin-left:50%">

By:   /s/ *Fred M. Wyshak, III*
Fred M. Wyshak, III
Assistant U.S. Attorney

</div>